UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

DANIEL VALLES,

          Plaintiff,

   vs.

FORT MASON, et al.,

          Defendants.

Case No:  20-cv-04192 SBA

**ORDER GRANTING MOTION FOR DETERMINATION OF GOOD FAITH SETTLEMENT**

Plaintiff Daniel Valles ("Plaintiff") brings this personal injury action against The Guardsmen, Fort Mason Center ("FMC"), MTM Builders, Inc. ("MTM"), and the United States of America ("USA").  Pending is the USA's motion for determination of good faith settlement.  The matter is suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).  For the reasons stated below, the motion is granted.

I.   **BACKGROUND**

    A.   FACTUAL ALLEGATIONS

This action concerns a slip and fall incident that occurred at the General's Residence in the Fort Mason area of Golden Gate National Recreation Area ("GGNRA").  GGNRA, which includes Fort Mason, is a park managed by the National Park Service ("NPS").  Hagin Decl. ¶ 7, Dkt. 60.  Originally constructed in 1877, the General's Residence is one of many structures of national historic importance in the Fort Mason Historic District.  Id. ¶¶ 7, 10, 11.  It is listed on the National Register of Historic Places.  Id. ¶¶ 13-14 & Ex. A, C.

In 2010 and 2011, the NPS decided to rehabilitate the General's Residence to serve as an event space.  Id. ¶ 24.  MTM served as the design-build contractor.  Id. ¶¶ 25-26.  As part of the project, a set of five stairs leading to the rear lawn, i.e., Stair 4, was reconstructed.  Id. ¶ 35.  In its historical state, Stair 4 featured a 2x4 flat railing spanning

the left side (descending), with no handrail on the right along the building's exterior wall. Id. ¶ 34.  The stairs' appearance and dimensions were reconstructed to match their historical state.  Id. ¶ 35.  The wooden handrail was enhanced with the addition of a metal tubular handrail running alongside that is extended at the top and bottom.  Id. ¶ 36.  No handrail was added along the building's exterior wall.  Id. ¶ 37.

After rehabilitation of the General's Residence was complete, NPS leased the property to FMC to operate as an event space.  Id. ¶ 39 & Ex. J.  The Guardsmen, a nonprofit organization, rented the space for its annual Kentucky Derby party, which was held on May 4, 2019.  Plaintiff attended the party and fell while descending Stair 4. Brakebill Decl., Ex. C ("Valles Dep.") at 37-41, Dkt. 84.  After the fall, Plaintiff saw a liquid and "raised bumps" that appeared to be ice on the steps.  Id. at 42-43.  Plaintiff does not recall what he did with his hands during the fall or whether he tried to grab a handrail. Id. at 59.  As a result of the fall, Plaintiff suffered injuries to his ankle that have required and continue to require medical treatment, including surgery and rehabilitation.

### B.   PROCEDURAL HISTORY

Plaintiff filed the instant action in June 2020, Dkt. 1, and filed the operative First Amended Complaint ("FAC") on January 7, 2021, Dkt. 42.[1]  Pursuant to the Federal Tort Claims Act, Plaintiff alleges one claim against the USA, styled "Government Liability – Dangerous Condition of Public Property."  FAC ¶¶ 15-27.  It alleges the USA created a hazardous, dangerous, or defective condition in the form of "slippery substances on walking surfaces, slippery steps, and exterior steps lacking adequate handrails."  Id. Plaintiff also alleges a claim for premises liability against FMC and the Guardsmen, id. ¶¶ 28-38, and a claim for negligence against FMC, the Guardsmen, and MTM, id. ¶¶ 39-51.

The parties conducted extensive fact discovery, including seven depositions.  The USA then filed a motion to dismiss for lack of subject matter jurisdiction on the ground that the discretionary function exception bars Plaintiff's claim against the government.  The

---

[1] Plaintiff initially named the NPS as a defendant; however, it was later dismissed from the action pursuant to the stipulation of the parties.  See Dkt. 30.

motion was pending when the parties appeared for a settlement conference before the assigned magistrate judge.  At the settlement conference, the action settled in full as to the USA and MTM; it did not settle as to FMC or The Guardsmen.  As is pertinent here, the USA agreed to pay Plaintiff $100,000 in exchange for a dismissal with prejudice of Plaintiff's claim against it.  Brakebill Decl. ¶ 3 & Ex. A.  MTM agreed to stipulate that the settlement between Plaintiff and the USA is made in good faith, but FMC and The Guardsmen (hereafter, "Remaining Defendants") refused to do so.  This motion followed.

## II.   **LEGAL STANDARD**

"Where a release, dismissal with or without prejudice or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort … [i]t shall discharge the party to whom it is given from all liability for any contribution to any other parties."  Cal. Civ. Proc. Code § 877(b).  Before a settlement between the plaintiff and one or more joint tortfeasors can become final, the court must determine whether it was made in good faith.  Id. § 877.6.  "A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor … from any further claims against the settling tortfeasor or … for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault."  Id. § 877.6(c).

The good faith inquiry is guided by the dual goals of California's tort contribution laws—the equitable sharing of costs among the parties at fault and the encouragement of settlements.  Tech-Bilt, Inc. v. Woodward-Clyde & Assocs., 38 Cal. 3d 488, 494 (1985).  To that end, courts should inquire "whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries."  Id. at 498.  "This is not to say that bad faith is 'established by a showing that a settling defendant paid less than his theoretical proportionate or fair share.'"  Id. (citation omitted).  "Such a rule would unduly discourage settlements," given that damages are often speculative, the probability for legal liability is often uncertain or remote, and even a disproportionally low settlement figure may be reasonable where the

settlor is insolvent, uninsured, or underinsured.  Id.  "Moreover, such a rule would tend to convert the pretrial settlement approval procedure into a full-scale mini-trial."  Id.

Accordingly, the California Supreme Court has identified various factors to be considered in determining whether a settlement is made in good faith, including (1) a rough approximation of the plaintiffs' total recovery and the settlor's proportionate liability; (2) the amount paid in settlement; (3) the allocation of settlement proceeds among plaintiffs; (4) recognition that a settlor should pay less than it would if it were found liable after trial; (5) the settlor's financial condition and insurance policy limits; and (6) the existence of collusion, fraud, or tortious conduct aimed to injure the interests of the nonsettling defendants.  Id. at 499.  The party asserting the lack of good faith, who has the burden of proof on that issue, must show "that the settlement is so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the statute." Id. at 499-500 (citing Cal. Civ. Proc. Code § 877.6(d)).

## III.   **DISCUSSION**

Defendant USA moves for a determination that its settlement with Plaintiff is made in good faith.  As discussed in greater detail below, the Tech-Bilt factors support such a finding, and Remaining Defendants fail to satisfy their burden of demonstrating that the settlement is so far "out of the ballpark" in relation to those factors as to be inconsistent with the equitable objectives of § 877.6.[2]

_____

[2] As a threshold matter, Remaining Defendants argue that the USA's motion must be denied because it is not supported by "substantial evidence."  See Opp'n at 3-5, Dkt. 87. This argument is unpersuasive.  Remaining Defendants focus on the perceived deficiency of counsel's declaration, without due consideration for the exhibits attached thereto, including a copy of the proposed settlement agreement, deposition excerpts, and written discovery responses.  Dkt. 84.  Remaining Defendants also disregard the other record evidence cited by the USA, including the Hagin, Brakebill, and Woodruff declarations, as well as the hundreds of pages of exhibits attached thereto.  Dkt. 60, 71, 72.  The evidence presented is more than sufficient for application of the Tech-Bilt factors.  See ABF Freight Sys., Inc. v. United States, No. 11-04663, 2013 WL 842856, at *5 (N.D. Cal. Mar. 6, 2013) (rejecting argument that the proposed settlement was not supported by "substantial evidence" where the record included over 200 pages of evidentiary exhibits, including a copy of the proposed settlement and excerpts of several depositions); see also Tech-Bilt, 38 Cal. 3d at 499 ("practical considerations obviously require that the [good faith] evaluation be made on the basis of information available at the time of settlement").

### A.    POTENTIAL PROPORTIONATE LIABILITY

The USA asserts several defenses to liability in this action.  First, the NPS transferred operational custody of the property to FMC through its lease.  Specifically, the lease provides that FMC "shall be solely responsible for the repair and maintenance of the interior and exterior of the Premises … during the Lease Term."  Hagin Decl., Ex. J § 9.1. The USA therefore has a contractual defense to liability with respect to repair and maintenance issues at the General's Residence at the time of Plaintiff's injury.

Remaining Defendants do not dispute this fact.  Opp'n at 5 (noting "it is undisputed that the NPS entered into a lease with FMC").  Rather, they argue that the lease does make FMC responsible for "construction or construction decisions or remodels to alter the historical nature of the property."  Id.  According to Remaining Defendants, the NPS "made a conscious decision" regarding how to build the staircase.  Id.  Construction decisions, however, are addressed by the USA's second defense, the discretionary function exception. Remaining Defendants wholly ignore this issue.

"The discretionary function exception retains the United States's sovereign immunity for '[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'"  Chadd v. United States, 794 F.3d 1104, 1108 (9th Cir. 2015) (quoting 28 U.S.C. § 2680(a)).  For a claim to fall within the exception, (1) the government's actions must be discretionary in nature, i.e., acts that involve an element of judgment or choice; and (2) that judgment must be of the kind the exception was designed to shield, i.e., actions and decisions based on social, economic, or political policy.  Id. at 1108-09 (citations omitted).

The record demonstrates that various policies and regulations explicitly imbue the NPS with discretion to make rehabilitation decisions on historical cultural resources like the General's Residence.  See Hagin Decl. ¶¶ 15-23, 27-28.  In making such decisions, the holistic approach prescribed by NPS policy requires the consideration of various factors, including preservation of the historic resource, aesthetics, accessibility, use, safety,

feasibility, and financial/staffing resource limitations.  Id. ¶¶ 23, 28; Woodruff Decl. ¶¶ 5-8, Dkt. 72.  The record further demonstrates that the NPS considered these factors in rehabilitating the General's Residence.  Hagin Decl. ¶¶ 28, 34-36.

Remaining Defendants admit that "[t]he NPS has discretion in the maintenance of buildings under their purview and more specifically, historic buildings which include Fort Mason."  Opp'n at 3.  They nonetheless question the NPS's decision not to install a second handrail on Stair 4.  "[W]here there is even *one* policy reason why officials may decide not to take a particular course of action to address a safety concern," however, the discretionary function exception applies.  Chadd, 794 F.3d at 1112 (holding exception applied to the NPS's decision not to destroy a mountain goat prior to its fatal attack on a hiker; though human safety was a priority, the NPS also weighed other factors, such as public enjoyment of wildlife).  Thus, if the NPS decided not to add a second handrail due to considerations regarding preservation of the General's Residence, sovereign immunity bars this claim.

The USA further argues that, even if the claim is not barred, the record contains substantial evidence showing it did not create a hazardous, dangerous, or defective condition at the General's Residence.  The NPS manager of the rehabilitation project testified that installation of a single handrail allowed persons to safely navigate Stair 4.  Brakebill Decl., Ex. A ("Hagin Dep.") at 143:4-8, 144:1-145:18, 152:5-8, Dkt. 71.  Stair 4 was traversed frequently without incident.  Id., Ex. B ("Simon Dep.") at 89-101.  In the ten years since the stairs were rebuilt, Plaintiff's is the only known injury/claim.  Brakebill Decl., Ex. D at 7, Dkt. 84.  Although Remaining Defendants may argue that the stairs were unsafe as constructed, there is certainly substantial evidence to support a contrary finding.

In sum, the USA has a contractual defense to liability insofar as Plaintiff's injuries were caused by repair or maintenance issues.  To the extent the design of the stairs—i.e., lack of a second handrail—caused or contributed to Plaintiff's injuries, sovereign immunity very likely bars Plaintiff's claim against the government.  And even if such claim were not barred, there are serious questions as to whether and to what extent the lack of a second handrail (as opposed to the presence of liquid and/or ice on the stairs) was to blame.  The

USA's proportion of potential liability is thus diminished.  See ABF Freight Sys., 2013 WL 842856, at *8 (finding proposed settlement roughly approximated settling defendants' share of potential liability considering significant causation and comparative fault issues).

### B.   POTENTIAL RECOVERY, SETTLEMENT, & OTHER FINANCIAL FACTORS

In discovery, Plaintiff quantified specific damages totaling at least $323,236.98. Brakebill Decl. ¶ 12.  This included sums paid "out of pocket" for transportation, medical, and miscellaneous expenses ($48,353.26); past medical costs ($114,883.72); and projected future medical costs ($160,000).  The USA acknowledges that Plaintiff has not yet quantified his past and future wage loss, which he characterized during deposition as a loss of income attributable to ongoing medical treatment and rehabilitation that interfered with his business.  Id. ¶ 13.  Plaintiff also had not yet quantified his pain and suffering.  Id.

The proposed settlement amount is $100,000.  This figure "must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be."  Tech-Bilt, 38 Cal. 3d at 499 (quotation marks and citation omitted).  Notably, because there is only one plaintiff, there is no need to allocate the settlement proceeds.  Additionally, as there is no evidence the USA would be unable to satisfy a judgment, its financial condition and/or insurance policy limits do not bear on the analysis.  The question, then, is whether a settlement of $100,000 is within the reasonable range of the USA's fair share, given the uncertainty surrounding liability and damages, as well as the fact that settlement defendants "are allowed to receive a significant discount." ABF Freight Sys., 2013 WL 842856, at *8 (finding proposed settlement reasonable over non-settling defendants' objections in light of these factors).

In opposing the proposed settlement, Remaining Defendants argue that "$100,000 is nothing more than a mere token and is so far 'out of the ballpark' that it cannot be equated with good faith."  Opp'n at 6.  The starting point for their analysis is Plaintiff's settlement demand.  They note Plaintiff initially requested $2,700,000 but reduced his demand to $2,000,000 after MTM and the USA settled.  Id.  Disclosure of these demand figures is improper.  See Fed. R. Evid. 408(a) (evidence of a settlement demand is inadmissible to

prove or disprove the validity or amount of a disputed claim); <u>see also</u> N.D. Cal. ADR L.R. 7-4.  Even setting that matter aside, Remaining Defendants present no evidence showing Plaintiff's demand is a reasonable approximation of his expected recovery at trial.  Indeed, Remaining Defendants admit that "Plaintiff's demand is certainly excessive[.]"  Opp'n at 6.  Moreover, Remaining Defendants fail to contend with the facts that: there is a strong likelihood the USA would prevail on one or more defenses to liability; even if there is potential for liability, there are serious questions as to the USA's comparative fault; and, as to any fault that may lie with the USA, "settlements are usually far less than what may be recovered at trial."  <u>ABF Freight Sys.</u>, 2013 WL 842856, at *6 (noting a plaintiff may recover "double or even triple" the settlement amount at trial).

In sum, the USA is one of at least four defendants, and any recovery against the USA (let alone the extent of recovery) is uncertain.  Although Remaining Defendants argue that the settlement amount represents only 5% of Plaintiff's demand, there is no admissible evidence supporting the use of that figure as a basis for comparison.  On the other hand, the settlement amount represents 31% of Plaintiff's quantified damages to date.  Even if Plaintiff's damages ultimately total $650,000 or $1,000,000, the settlement amount would be approximately 10 to 15% of that sum.  Considering the pertinent economic factors, including the likelihood of recovery, the proposed settlement roughly approximates the USA's proportion of potential liability.

## C.   COLLUSION, FRAUD, OR TORTIOUS CONDUCT

Lastly, the settlement was reached through arms-length negotiations at a settlement conference before a magistrate judge of this court.  <u>See</u> Dkt. 79 (noting the case settled in full as to the USA and MTM after a settlement conference of 3.4 hours).  The USA agrees to pay Plaintiff $100,000 in exchange for a dismissal with prejudice of Plaintiff's claim against it; no other consideration is contemplated.  Brakebill Decl. ¶ 5, Ex. A.  In the absence of any contrary evidence, the settlement thus appears free of collusion, fraud, or tortious conduct aimed to injure the interests of the joint tortfeasors.  <u>See</u> <u>ABF Freight Sys.</u>, 2013 WL 842856, at *9.  Remaining Defendants concede that "there is no specific evidence

of tortious conduct," noting only that the inverse is also true, i.e., "there is no evidence to negate such conduct on the part of the settling party."  Opp'n at 7.  Because the party asserting the lack of good faith bears the burden of proof, however, the absence of such evidence weighs in favor of approving the proposed settlement.

## IV.   **CONCLUSION**

For the reasons stated above, IT IS HEREBY ORDERED THAT the USA's motion for determination of good faith settlement is granted.

IT IS SO ORDERED.

Dated: August 23, 2022

_Saundra B Armstrong_ RS
Richard Seeborg for Saundra B. Armstrong
United States District Judge